IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CRAIG WILLIAMS, | ) | |
| | ) | Civil Action No. 12 - 944 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | District Judge Mark R. Hornak |
| | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| JOHN WETZEL, *of the Department of Corrections*, DORINA VARNE, *Chief Grievance Coordinator*, TINA FRIDAY, *Records Officer*, JEFFREY R. ROGERS, *Manager*, TRACY SHAWLEY, *Grievance Coordinator*, LOUIS S. FOLINO, | ) ) ) ) ) ) ) ) | ECF No. 36 |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I. RECOMMENDATION

For the reasons that follow, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 36) be granted.

### II. REPORT

Craig Williams ("Plaintiff") is an inmate committed to the custody of the Pennsylvania Department of Corrections. He was formerly a capital inmate who was resentenced to life without parole on May 1, 2012, upon the District Attorney's formal withdrawal of the death penalty. On July 10, 2012, he initiated this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, for alleged violations of his rights arising out of an approximate five-year and ten-month period of confinement in the Capital Case Unit ("C.C.U.") (a.k.a. "death row") at SCI-Greene, during which time he claims that he was a "pretrial detainee," that his confinement on death row

1

was "punishment," and that he should have been housed in the general population of the prison. For the reasons set forth herein, Defendants should be granted summary judgment.

### A. Factual Background

On June 16, 1988, following a jury trial in the Court of Common Pleas of Philadelphia County, Plaintiff was found guilty of, among other crimes, first degree murder. *See* Williams v. Love, 1995 U.S. Dist. LEXIS 6674, at *1 (E.D. Pa. May 17, 1995). After a penalty hearing, the jury returned a sentence of death, which was imposed upon Plaintiff on January 29, 1990. Id. at *2. His judgment of sentence was affirmed by the Pennsylvania Supreme Court on October 9, 1992. Id.; *see also* Commonwealth v. Williams, 615 A.2d 716 (Pa. 1992).

Plaintiff filed a petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"), which was ultimately denied on December 4, 1997. *See* Commonwealth v. Williams, 782 A.2d 517 (Pa. 2001). The denial of post-conviction relief was reversed on appeal on grounds of procedural error and the appeals court remanded to the lower court to have it corrected. Id. at 562, 569. On June 8, 2006, after numerous years of litigation in the lower court, the Commonwealth conceded that a new penalty hearing was warranted. *See* Commonwealth v. Williams, 980 A.2d 510, 517 (Pa. 2009). On July 11, 2006, the lower court entered an order granting Plaintiff a new penalty hearing but denying the guilt-phase claims contained in his PCRA petition. Id. The lower court issued its opinion in support of its decision on November 29, 2006. Id. Plaintiff appealed the denial of his guilt-phase claims and the Pennsylvania Supreme Court affirmed the denial of PCRA relief in the form of a new trial on October 2, 2009. Id. at 533. Plaintiff's petition for certiorari to the United States Supreme Court was denied on June 10, 2010. *See* Williams v. Pennsylvania, 130 S. Ct. 3353 (2010).

The case returned to the Court of Common Pleas and the District Attorney formally withdrew the death penalty on May 1, 2012.[1] See ECF No. 38-1 at p.17. Plaintiff was resentenced to life without parole on his first degree murder conviction and ordered to be placed in general population forthwith. Id. Shortley thereafter he was transferred from SCI-Greene and sent to SCI-Albion where there is no "death row."

**B. Summary Judgment Standard**

Defendants have filed a Motion for Summary Judgment. Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

---

[1] From Plaintiff's criminal court docket sheet, it appears that the delay in resentencing was attributed to appointment of counsel for Plaintiff, as well as several continuances filed by both the Commonwealth and the defense. See ECF No. 38-1 at pp.15-17.

3

of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

C. Discussion

**1. Confinement in the C.C.U. Pursuant to DOC Policy**

Plaintiff's first claim relates to the period of time he spent in the C.C.U. after the PCRA court granted Plaintiff a new sentencing hearing on July 11, 2006, and until the District Attorney formally withdrew the death penalty on May 1, 2012, at which time Plaintiff was sentenced to life imprisonment without the possibility of parole. During this time, Plaintiff claims that he was a "pretrial detainee" because his death sentence had been vacated and that he should have been housed in the general population of the prison because the District Attorney did not appeal the grant of a new sentencing hearing.[2] Defendants maintain that his confinement in the C.C.U. was authorized by Department of Corrections Policy DC-ADM 6.5.8.1.S, as interpreted by the department to mean that an inmate whose death sentence has been set aside must stay on death row until it is clear that the death penalty will not be re-imposed and that the inmate has been resentenced to life in prison. They contend that this was explained to Plaintiff numerous times in response to his grievances; specifically, that even though he had been granted a new sentencing hearing, his case was on appeal from the denial of PCRA relief in the form of a new trial and that

---

[2] After several failed attempts to obtain the PCRA court's July 11, 2006 order granting Plaintiff a new sentencing hearing but denying him a new trial, the Court does not know what the PCRA court stated in its order and whether Plaintiff's death sentence was actually "vacated" as he alleges.

4

a death sentence could still be re-imposed. Therefore, until it was established that he would not be resentenced to death, he had to stay in the C.C.U. Plaintiff takes issue with the DOC's interpretation of the policy arguing that because the District Attorney did not appeal the PCRA court's grant of a new sentencing hearing- and Plaintiff appealed the denial of relief in the form of a new trial- he should have been released into the general population at that time. He claims that his continued confinement on death row violated his due process rights and that it was wrongly punitive.

First, pursuant to the aforementioned DOC policy, the undersigned agrees with Defendants' position as to why Plaintiff was confined in the C.C.U. during the disputed period of time. Capital Case Procedures Manual 6.5.8, Section 1 states, in pertinent part:

S. Modification of Sentence

1. In the event that an order is received modifying the sentence of a Capital Case inmate to life imprisonment due to a re-sentencing proceeding held as the result of an appeal or Post Conviction Relief Act, or as the result of a commutation, the facility Records Supervisor must determine whether the order is valid and whether the District Attorney intends to appeal the order.

2. If the District Attorney intends to appeal, the inmate shall not be moved from the Capital Case unit until the appeal is resolved. However, the inmate may be moved from the Capital Case Unit, if the District Attorney does not file an appeal within 30 days.

3. If the District Attorney does not intend to appeal and if the inmate does not remain subject to an execution sentence as the result of a prosecution other than the sentence modified in the order, the inmate may be moved from the Capital Case Unit.

(ECF No. 38-2.) Plaintiff maintains that from July 11, 2006, until May 1, 2012, he was wrongfully detained in the C.C.U. in violation of this policy because his sentence was vacated when the PCRA court granted him a new sentencing hearing on July 11, 2006, and the District Attorney did not appeal that decision. However, Plaintiff is incorrect because it was not until

5

May 1, 2012, that condition 1 of the policy had been met since that is when Plaintiff's sentence was *modified* "to life imprisonment due to a re-sentencing proceeding." Before that time, there was no order modifying Plaintiff's sentence to life imprisonment. Plaintiff had been granted a new sentencing hearing by the PCRA court but the possibility of a death sentence was still on the table. Furthermore, Plaintiff's death sentence could have been re-imposed had the District Attorney not formally withdrew the death penalty at his re-sentencing proceeding on May 1, 2012. After Plaintiff was resentenced to life, condition 1 of the DOC policy had been met and he was promptly moved into general population.

It appears as though Plaintiff's claim is premised on the argument that the DOC did not follow condition 2 of their policy. He argues that, because the District Attorney did not appeal the PCRA court's grant of a new sentencing hearing, he should have been released to general population on July 11, 2006. As explained above, Plaintiff's argument is flawed because condition 1 of the policy - the modification of his sentence to life imprisonment *due to a re-sentencing proceeding* - did not occur until May 1, 2012. As far as the Court is aware, the District Attorney did not appeal Plaintiff's new sentence so he was then released out of the C.C.U. in accordance with condition 3 of the policy. The delay in Plaintiff's re-sentencing proceeding was attributable to his appeal of the denial of PCRA relief as to his guilt phase claims. The fact that Plaintiff spent five-years and ten-months in the C.C.U. waiting to be resentenced only to be resentenced to life does not give rise to a constitutional violation or a violation of the DOC's policy.

Finally, even though the undersigned has expressly determined that there was no violation of the DOC's policy with regard to Plaintiff's confinement in the C.C.U. after July 11, 2006, any violation of the policy that may have occurred does not automatically give rise to a

6

constitutional violation. The simple fact that prison regulations prescribe certain procedures does not mean that the procedures thereby acquire a federal constitutional dimension. United States v. Jiles, 658 F.2d 194, 200 (3d Cir. 1981); Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003) ("[T]here is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations . . . ."); Culbert v. Young, 834 F.2d 624, 628 (7th Cir. 1987) (the adoption of mere procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process); Shango v. Jurich, 681 F.2d 1091, 1101-02 (7th Cir. 1982) ("[A] state created procedural right is not itself a liberty interest . . . . States may decide to engage in such proceedings, but the due process clause does not compel them to do so because no constitutionally cognizable substantive interest of the prisoner is at stake."). Thus, violations of prison rules or regulations that require certain procedures, which are not compelled by the Federal Constitution because there is no liberty interest that those state mandated procedures protect, do not make out a claim under Section 1983. Hayes v. Muller, No. 96-3420, 1996 U.S. Dist. LEXIS 14987, at *20 n.5 (E.D. Pa. Oct. 10, 1996) ("[A] state does not violate an individual's federal constitutional right to procedural due process merely by deviating from its own established procedures"); Rowe v. Fauver, 533 F. Supp. 1239, 1246 n.10 (D. N.J. 1982) ("[A] failure by state officials to follow state procedural regulations not independently required by the Constitution fails to state a claim under the Due Process Clause.")

**2. Due Process**

    **a. Procedural Due Process**

Plaintiff's due process claim fails because he did not have a liberty interest in being housed in general population during the time he was waiting to be resentenced. This issue was

7

squarely addressed by the Commonwealth Court of Pennsylvania in Clark v. Beard, 918 A.2d 155 (Pa. Cmwlth. 2007). In Clark, the court considered the cases of death row inmates whose death sentences had been vacated but who were still being held on death row at SCI-Greene and SCI-Graterford. The court first stated that it is entirely within the discretion of the DOC where to house a particular inmate, and it noted that "matters of prison management are uniquely the province of the executive and legislative branches of government . . . [and] [f]or this reason, judges may not indiscriminately denominate the place a prisoner is housed; statutes and regulations establish the presumptive place of confinement." Id. at 160, 161 (citing Martin v. Jeffes, 501 A.2d 308, 310 (Pa. Cmwlth. 1985); Commonwealth v. Tuttles, 782 A.2d 560, 563 (Pa. Super. 2001)).

Pursuant to the Supreme Court's decision in Sandin v. Conner, 515 U.S. 472 (1995), wherein the Supreme Court examined the circumstances under which state prison regulations afford inmates a liberty interest protected by the Due Process Clause of the Fourteenth Amendment,[3] the Clark court determined that the inmate plaintiffs had failed to plead sufficient facts to show that they had a state created liberty interest in being confined under some other conditions. In pertinent part, the court stated that the plaintiffs'

> complaint describes the conditions of the Capital Case Unit, but it is devoid of any baseline against which to measure those conditions and determine whether they pose an "atypical and significant hardship." For example, Appellants do not describe any of the conditions in the general population that they presumably believe are less restrictive than other types of segregated housing at SCI-Greene or SCI-Graterford. In short, a fair reading of Appellants' complaint does not indicate how confinement in the Capital Case Unit imposes atypical and significant hardships on Appellants in relation to the ordinary incidents of prison life.

Clark, 918 A.2d at 162-63.

---

[3] In Sandin, the Supreme Court held that prison conditions deprive a prisoner of a state created liberty interest that is protected by due process guarantees when they result in "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 483.

Furthermore, to the extent that the inmates in Clark focused on the indefinite duration of their confinement on death row in order to support a finding of a protected liberty interest, the court disagreed because this factor was not sufficient to create such a liberty interest in and of itself, and, in any event, an inmate could successfully have his capital punishment replaced by a sentence eligible to be discharged from custody in the C.C.U. *See id*. at 164. Moreover, the Clark court stated that according to Supreme Court precedent, indefinite duration had to be coupled with other factors, including extreme conditions imposed upon the inmate, which deprive him "of almost any environmental or sensory stimuli and of almost all human contact." *See* id. at 163-64 (citing Wilkinson v. Austin, 545 U.S. 209 (2005)).[4]

Perhaps in an attempt to argue that he was deprived of a liberty interest and distinguish his case from Clark, Plaintiff has described, in detail, the conditions in the C.C.U. and how they are more restrictive than the conditions in general population. He states that the differences include, *inter alia*, daily confinement in the cell for twenty-two hours; confinement in a locked cage during the other two hours of the day for law library, yard, and showers; a limited number of job selections and opportunities; dining alone in the cell; limited selection of games, which can only be played with other inmates through holes in the cage fence; no indoor recreation, cellmates, cigarettes, ice cream, juice, razors, or boots; no virtual televised visits; no vocational programs; medical consults and phone calls at the cell door with no privacy; handcuffed while

---

[4] In Wilkinson, the United States Supreme Court held that the conditions in Ohio's "Supermax" facility, which are more restrictive than any other form of incarceration in Ohio, "including conditions on its death row or in its administrative control unit," imposed an atypical and significant hardship on inmates in relation to the ordinary incidents of prison life, and, therefore, inmates had a liberty interest in avoiding placement in the facility. Id. at 214. In finding that the Supermax facility imposed such a hardship on the plaintiffs, the Supreme Court relied on three factors: (1) the extreme conditions imposed upon the inmates, which deprived them of almost any environmental or sensory stimuli and of almost all human contact; (2) the indefinite duration of placement in the Supermax facility; and (3) the automatic disqualification of eligibility for parole consideration. Significantly, the Court noted that "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." Id. at 224.

9

escorted and getting a haircut; and no visits to commissary (although items are ordered and brought to the prisoner's cell).

First, the Court is aware, and Defendants' exhibits confirm, that the conditions of confinement for inmates held on death row are the same as those for inmates held in administrative custody for other reasons. *See* DC-ADM 802 (defines custody status for both). Second, as the court stated in Clark, death row inmates in Pennsylvania who are successful at having their death sentences modified are eligible to be discharged from the C.C.U.; therefore, it is possible that their confinement in the C.C.U. may not be of indefinite duration. This was not the case for the Wilkinson inmates at the Supermax facility in Ohio. *See*, *supra*, FN 4.

Applying the same standards that the court applied in Clark, the undersigned finds that Plaintiff has failed to establish that his confinement in the C.C.U. imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life and therefore he did not have a liberty interest in avoiding being housed on death row from July 11, 2006 until May 1, 2012.

Plaintiff maintains that he was not an "inmate" but rather a "pretrial detainee" after the PCRA court vacated his death sentence on July 11, 2006. Assuming for the sake of argument that he is correct, Plaintiff's procedural due process claim would still fail.

The Third Circuit has stated that, while there is no liberty interest for a pretrial detainee to remain in general population, he has one in not being indefinitely detained in restrictive housing without explanation or periodic reviews of the confinement. Stevenson, 495 F.3d at 69. To comport with Supreme Court precedent, the detainee is only due a "minimal degree of process." *See* Stevenson, 495 F.3d at 70 (citing Hewitt v. Helms, 459 U.S. 460, 474 (1983), "the Due Process Clause requires only an informal nonadversary review of evidence . . . in order to

confine an inmate feared to be a threat to institutional security to administrative segregation."). Thus, prison officials here were only required to provide Plaintiff with an explanation of the reason for his confinement in the C.C.U. and an opportunity to respond. *See* id. But Plaintiff does not complain that he was not given an explanation for his confinement in the C.C.U. during the disputed period of time. Rather, Plaintiff implicitly acknowledges that he was given an explanation because he disagrees with the DOC's interpretation and application of DC-ADM 6.5.8.1.S, and, because of that, complains that he was wrongfully housed in the C.C.U. In short, he does not even state a claim for a procedural due process violation. Plaintiff was informed on numerous occasions that he was being held in the C.C.U. pursuant to DOC policy because the re-imposition of the death penalty remained a possibility and he had not yet been resentenced to life. He grieved and appealed this issue on many occasions. Therefore, he was given the required explanation. The record also reveals that he received periodic reviews during this time. This was sufficient procedural due process.

### b. Substantive Due Process

With respect to Plaintiff's substantive due process argument, the Supreme Court has explained that "the core of the concept" of due process is "protection against arbitrary action" and that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998) (citation omitted); *see also* United Artists Theatre Circuit, Inc. v. Township of Warrington, Pa., 316 F.3d 392, 399-400 (3d Cir. 2003) ("our cases have repeatedly acknowledged that executive action violates substantive due process only when it shocks the conscience."). Defendants' conduct clearly does not rise to this standard. They explained to Plaintiff on many occasions that he was being kept in the C.C.U. in accordance with DOC policy, and, as explained herein, there are

11

many legitimate penological purposes for that policy and they were acting in accordance with it. In short, there is nothing about Plaintiff's confinement in the C.C.U. that "shocks the conscience" so as to give rise to a substantive due process violation. Therefore, this claim should be disposed of as well.

Assuming for the sake of argument that Plaintiff was a "pretrial detainee" after the PCRA court vacated his death sentence on July 11, 2006, his substantive due process claim would be analyzed under the standards set out in Bell v. Wolfish, 441 U.S. 520 (1979), where the Supreme Court held that a pretrial detainee may not be punished prior to the adjudication of guilt in accordance with due process of law. 441 U.S. at 535-36. Plaintiff claims that his confinement in the C.C.U. after July 11, 2006, violated his due process rights because it was "punishment" since his death sentence had been vacated and he was no longer a death-row inmate.

The Third Circuit addressed a very similar situation in Stevenson v. Carroll, 495 F.3d 62 (3d Cir. 2007). In Stevenson, two of the three inmate plaintiffs had their death sentences vacated and were awaiting resentencing. During that time, the inmates were housed in the secure housing unit. Recognizing that the plaintiffs considered themselves "pretrial detainees" at the moment their death sentences had been vacated, and also recognizing that the warden did not contest the plaintiffs' status as pretrial detainees for purposes of the appeal, the Third Circuit analyzed the plaintiffs' claim in accordance with Bell. Id. at 67 (citing Cobb v. Aytch, 643 F.2d 946, 962 (3d Cir. 1991), "The right to remain at liberty continues until a court pronounces a judgment of sentence, although after a jury has pronounced a guilty verdict the court may insist upon greater assurance that a defendant will submit to sentence."). The circuit went on to explain that unconstitutional punishment typically includes both objective and subjective components. Id. at 68. The objective component requires an inquiry into whether "the

12

deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]" Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Thus,

> [A] particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.

Stevenson, 495 F.3d at 68 (quoting Rapier v. Harris, 172 F.3d 999, 1005 (7th Cir. 1999)).

As Plaintiff does here, the plaintiffs in Stevenson alleged that the conditions of their confinement in the secure housing unit were stricter than those for the general population and that they had been placed in that unit by defendants in order to punish them. The Third Circuit found that the district court had improperly dismissed the inmates' complaint because it had not made either an objective inquiry into the severity of the deprivations or a subjective inquiry into the mental state of the officials. Further, because the Stevenson inmates alleged that they had been arbitrarily singled out from other similarly situated inmates for this treatment, this intimated "a degree of as yet unexplained arbitrariness in the procedures regarding placement in the SHU." Stevenson, 495 F.3d at 68.

When evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the "totality of the circumstances within the institution," but, when necessary, "discovery need not be extensive." Id. at 68-69.

> Although the substantive and procedural due process evaluations are distinct, a showing by the prison officials that a restrictive housing assignment is predicated on a legitimate managerial concern and is therefore not arbitrary or purposeless, will typically foreclose the substantive due process inquiry.

Id. at 69.

The purpose behind the DOC's policy of housing inmates in the C.C.U. when the possibility of re-imposition of the death sentence still exists is apparent. There is no doubt that an inmate in such a situation presents a heightened risk and threat to the safety and security of staff and other inmates. According to Executive Deputy Secretary Shirley R. Moore-Smeal, who at one time in her career was the Acting Secretary of the Pennsylvania Department of Corrections, such an inmate may attempt to escape from the facility due to confinement under less restrictive conditions, could use his new freedoms to retaliate against staff and other inmates, could obtain instruments to create makeshift contraband inflicting injury upon himself or others under the assumption that they have "nothing left to lose," or just be more likely to violate facility rules and regulations in general for the same reason. *See* ECF No. 38-6.

In the seminal case of Hewitt v. Helms, 459 U.S. 460 (1983), the Supreme Court emphasized that

> [i]n the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior.

Id. at 474 (internal citations omitted). Clearly, the restrictive housing assignment for inmates in Plaintiff's situation is predicated on many legitimate penological concerns and is therefore not arbitrary and purposeless. This Court is not in a position to second-guess that penological judgment. *See* Stevenson v. Carroll, 495 F.3d 62, 71 (3d Cir. 2007) ("[W]e are unwilling to substitute our judgment on these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities.") (quoting Block v. Rutherford, 468 U.S. 576, 588 (1984)). Plaintiff's confinement in

the C.C.U. was not arbitrary or punitive. This should foreclose the substantive due process inquiry.

### 3. Lack of Personal Involvement

Defendants Friday, Rodgers, Shawley and Varner argue that they are entitled to summary judgment because Plaintiff has not demonstrated that they had personal involvement in the alleged wrongdoing. They are correct and this deserves brief analysis.

For liability under 42 U.S.C. § 1983, a defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citing Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.2d at 1207. However, alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement; allegations "must be made with appropriate particularity." Id.

The above mentioned Defendants' involvement in this case was limited to following DOC policy and responding to Plaintiff's grievances and appeals. This is insufficient to establish personal involvement. *See* Simonton v. Tennis, 437 F. App'x 60, 62 (3d Cir. 2011) ("[A] prison official's secondary review of an inmate's grievance or appeal is not sufficient to demonstrate the personal involvement required to establish the deprivation of a constitutional right."); Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison grievance, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct); Manns v. Bledsoe, No. 10-1564, 2011 U.S. Dist.

15

LEXIS 102268, 2011 WL 4048781, at *4 (M.D. Pa. Sept. 12, 2011); Mincy v. DeParlos, No. 08-0507, 2011 U.S. Dist. LEXIS 31168, 2011 WL 1120295, at *7 (M.D. Pa. Mar. 24, 2011); Wilkerson v. Schafer, No. 09-2539, 2011 U.S. Dist. LEXIS 25916, 2011 WL 900994, at *7 (M.D. Pa. Mar. 14, 2011) (allegations that defendants "should be held liable for due process violations because they should have become aware of them through their review of his misconduct appeals is insufficient to establish their personal involvement in the underlying unconstitutional conduct"); Logan v. Lockett, No. 07-1759, 2009 U.S. Dist. LEXIS 24328, 2009 WL 799749, at *8 (W.D. Pa. Mar. 25, 2009); Croom v. Wagner, No. 06-1431, 2006 U.S. Dist. LEXIS 64915, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) (holding that neither the filing of a grievance nor an appeal of a grievance is sufficient to impose knowledge of any wrongdoing); Ramos v. Pa. Dept. of Corr., No. 06-1444, 2006 U.S. Dist. LEXIS 51582, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement). They should be granted summary judgment on this basis alone.

### III. CONCLUSION

For the reasons set forth above, it is respectfully recommended that Defendants' Motion for Summary Judgment (ECF No. 36) be granted.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response. A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated: December 9, 2013

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc: Craig Williams
BX-9919
SCI Albion
10745 Route 18
Albion, PA 16475
*Via First Class Mail*

Counsel of Record
*Via ECF Electronic Mail*